**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JANICE F. COMPTON,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:13-CV-00537-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY**, | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On December 14, 2009, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. In both applications, she alleged onset of her disability beginning March 29, 2007. The Commissioner initially denied both claims on April 14, 2010. The claimant then filed a written request for hearing before an Administrative Law Judge on May 21, 2010, and the ALJ held a hearing by video-conference on November 1, 2011.

In a decision dated January 19, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for disability benefits. (R. 11). The Appeals Council then denied the claimant's request for review, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence does not support the ALJ's findings regarding the

1

claimant's mental impairment, and this court will reverse and remand the decision of the Commissioner.

## II. ISSUES PRESENTED

Because the claimant is not represented by counsel, the court did not require her to submit a brief. Because she filed no brief, this court construes her issue to be whether the ALJ's finding that the claimant did not meet Medical Listing §12.05C regarding her mental impairments lacks substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*, but will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because

they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).  Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence exists in the record to support it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

3

>An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

As to mental impairments, the ALJ must base his evaluation on the "special technique" dictated by the Psychiatric Review Technique Form (PRTF). *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005); 20 C.F.R. § 404.1520a-(a). The "special technique" requires an evaluation of the impact of the claimant's mental impairment on (1) activities of daily living (ADLs); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Moore*, 405 F.3d at 1213. Failure to either complete the PRTF and append it to the ALJ's opinion, or to incorporate the PRTF's "mode of analysis" into the ALJ's decision constitutes reversible error. *Moore*, 405 F.3d at 1214.

Additionally, a finding of disability for mental retardation under the listings requires a finding that the claimant "(1) ha[s] significantly subaverage general intellectual functioning; (2) ha[s] deficits in adaptive behavior; and (3) ha[s] manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997); *see* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 §12.05. A claimant's mental retardation is sufficiently severe when it meets the requirements of §12.05A, B, C, *or* D. Under §12.05C, a claimant must have a valid verbal, performance, or full scale IQ ranging from 60 to 70, and an additional mental or physical impairment imposing an additional work-related limitation on function.

The Eleventh Circuit, however, has determined that an ALJ is not required to base a finding of mental retardation on the results of an IQ test alone when he evaluates whether a claimant meets

4

the requirements of §12.05C. *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986); *see also Strunk*

*v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984) (finding that no case law "requir[es] the Secretary

to make a finding of mental retardation based *solely* upon the results of a standardized intelligence

test in its determination of mental retardation"). An ALJ is required to base his determination of

mental retardation on the combination of intelligence tests and the medical report. ALJs evaluate

intelligence tests "to assure consistency with daily activities and behavior." *Popp*, 779 F.2d at 1499.

If intelligence tests are inconsistent with the medical record and/or the claimant's daily activities and

behavior, good reason exists to believe that the intelligence tests should be discredited. *Popp*, 779

F.2d at 1500. When the evidence conflicts, "it is the ALJ's responsibility, not the Court's, 'to

reconcile inconsistencies in the medical evidence.'" *White v. Astrue*, 2012 U.S. Dist. Lexis 44494,

*14 (W.D.N.C. 2012) (quoting *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976)).

Adaptive functioning is defined as an "individual's progress in acquiring mental, academic,

social and personal skills as compared with other unimpaired individuals of his/her same age."

Programs Operation Manual System DI 24515.056(D)(2).  When a claimant presents evidence of

a full scale IQ score, between 60 and 70, this raises the rebuttable presumption that the claimant

manifested deficits in adaptive functioning prior to the age of 22, not only at the time of testing.

*Hodges v. Barnhart*, 276 F. 3d 1265, 1268-1269 (11th Cir. 2001).  The ALJ must presume mental

impairment before age 22, because mental retardation generally does not improve as a person ages.

*Hodges*, 276 F.3d at 1269.

## V. FACTS

The claimant was sixty years old at the time of the administrative hearing and did not finish

high school.[1] Her past work experience includes housekeeping in hotels and a hospital, working as a cook in the fast-food industry, and picking produce at a farm. According to the claimant, she became unable to work after a stroke on March 29, 2007, that left her with numbness, problems with her left side, depression, anxiety, and poorly controlled high blood pressure. (R. 28-33).

*Physical and Mental Impairments*

The claimant suffered a stroke on March 29, 2007, and stayed at Nashville General Hospital for five days. The claimant testified in her hearing that, after her stroke, she went to physical therapy and had to use a walker for three weeks. Medical records show that, upon discharge from Nashville General Hospital, the claimant had improved significantly, and her left-sided weakness from the stroke resolved within a month. (R. 204, 244).

No medical evidence in the record indicates that the claimant sought treatment with a doctor from 2007 to 2009. The claimant is not insured and has had a difficult time obtaining healthcare. (R. 346).

In 2009, the claimant began to visit Shade Tree Clinic, Vanderbilt University's medical-student-run, free clinic. She visited this clinic on January 24, 2009, February 28, 2009, and March 21, 2009. During her three visits, she presented with multiple complaints, including anxiety, and depression, along with other physical complaints. At one visit, Dr. Atuhani Burnett stated that the claimant complained of "mild chronic anxiety which does not interfere with her daily activities." The doctors frequently commented that the claimant was facing a number of complicated issues regarding the relationship with her husband and being robbed. On her last visit, in March 2009, the

---

[1] The record is unclear about when the claimant left high school. The claimant states at different times that she left in 8th grade (R. 260), 9th grade (R. 345), and 10th grade (R. 29, 141).

doctor determined that the claimant had mild chronic anxiety that did not interfere with her daily activities and did not warrant the risks of treatment. (R. 244-250).

The claimant visited Dr. Bharat K. Vakharia, a general physician at Internal Medicine, on March 23, 2010, upon the request of Disability Determination Services. He performed an x-ray of the lumbosacral spine, as well as a physical exam. He determined that, although the claimant did have some residual weakness of her left side resulting from the 2007 CVA, her muscle strength was a 4/5. Dr. Vakharia stated that the claimant had Duyputren's Contracture, a hand deformity of both hands, as well as osteoarthritis of the knee. (R. 282).

On March 9, 2010, licensed psychologist, John R. Haney, Ph.D., conducted a clinical interview with the claimant at the request of the Social Security Administration. His mental status exam revealed that the claimant could not perform serial sevens; could count forward by threes; had difficulty with other simple problems in change-making and arithmetic; had difficulty finding similarities between paired objects and interpreting simple proverbs; could recall three digits forward and two digits backward; and recalled zero of three objects after five minutes. The claimant described her average day, stating that she mostly stays inside, works on word puzzles, and does some light housework. She denied any other hobbies or activities. Dr. Haney stated that he regarded the claimant's statements as true.

Dr. Haney indicated that the claimant's recent and remote memory appeared somewhat impaired, and that her intelligence was estimated at borderline range or lower, or perhaps mild mental retardation. He also stated that the claimant's ability to function in most jobs appeared moderately to severely impaired due to her physical and emotional limitations. He held the opinion that the claimant's condition would probably remain unchanged in the next six to twelve months,

and that she needed further medical treatment for her physical problems and depressive symptoms. (R. 261-260).

On March 18, 2010, Eugene E. Fleece, Ph.D, a state agency physician, performed a Psychiatric Review Technique (PRT) and a Mental Residual Functional Assessment, at the request of the Social Security Administration. He identified that Medical Listings §12.02 and §12.04 were the listing categories upon which he based his opinion. Dr. Fleece indicated that for listing §12.02 (Organic Mental Disorders), the claimant had a medically determinable impairment that did not precisely satisfy the diagnostic criteria of the listing. Dr. Fleece also indicated that the claimant has a depressive disorder that did not meet a listing under §12.04 (Affective Disorders). Dr. Fleece did not specifically address listing §12.05, regarding IQ scores and mental retardation, including §12.05C.

Dr. Fleece also stated that the claimant had marked limitations in her ability to understand, remember, and carry out detailed instructions. Under "paragraph B," Dr. Fleece stated that the claimant's mental disorders moderately restricted her activities of daily living; created moderate difficulties in maintaining concentration, persistence or pace; and brought on one or two episodes of decompensation, each of extended duration. Dr. Fleece also determined that the claimant's mental limitations did not meet the "paragraph C" criteria because the evidence did not establish it.

In his consultant's notes, Dr. Fleece noted that he had analyzed Dr. Haney's notes when making his report, but stated that Dr. Haney's psychological and physical review had no value, because a consulting psychologist did not need to comment on the claimant's physical illnesses and impact. Dr. Fleece indicated that Dr. Haney's examination was not credible, due to its lack of "psych specific" allegations. Dr. Fleece also examined the claimant's activities of daily living, including that

8

the claimant lives with family; takes care of her personal hygiene; takes her medications; prepares meals with the help of family; does some household chores; cannot drive; can count change, but does not have a checking or savings account; watches television; keeps in touch with others; and goes to church sometimes. (R. 262-279).

In June 2010, the claimant began visiting the Good Samaritan Health Clinic, a low cost health clinic that provides free or low cost medication, and sought treatment eight times in 2010 and six times in 2011. During these visits, the claimant complained of physical issues including hypertension, diminished hearing, dizziness, flu-like symptoms, wheezing, acid reflux, and aching hands. She also presented with depression, anxiety, and sleep problems on at least three occasions: May 6, 2011, June 3, 2011, and July 5, 2011. The doctor prescribed Zoloft, Seroquel and Amitriptyline to treat her mental issues, and the claimant reported that these medications helped her symptoms.[2] The doctor also prescribed a number of other medications to treat her hypertension, upper-respiratory issues, chronic kidney disease, acid reflux and pain in her hands, secondary to Duyputren's Contracture. (R. 295-343).

Licensed psychologist, Robert A. Storjohann, Ph.D, performed a psychological evaluation of the claimant on November 7, 2011, upon the request of her lawyer. The claimant told Dr. Storjohann that she lived with her husband and mother-in-law, and that she had a good relationship with her grown children and her parents. She described her daily activities as minimal light housework; laundry with the help of her husband; cooking a little occasionally, although her husband does most of the cooking; occasionally going shopping with her husband; working on word puzzles;

---

[2] The specific doctors' names, who treated the claimant at the Good Samaritan Health Clinic, were illegible in the record.

watching television; talking on the telephone; and occasionally attending church. She indicated that she only spends time with her family members.

The claimant reported to Dr. Storjohann that she had always been a slow learner, and repeated the third grade. She described poor reading, comprehension, and expressive writing skills, as well as problems with mathematics. She stated that she would be unable to manage her own financial affairs without assistance.  The claimant indicated to Dr. Storjohann that she is constantly distressed by her health problems; her inability to work; the decline in her cognitive abilities; her financial difficulties; and her lack of health insurance. Dr. Storjohann noted that the claimant stated that her depression was marked by depressive moods, occasional crying spells, low energy, and chronic fatigue. She described losing pleasure and interest in activities, and said she was often irritable and easily frustrated. The claimant also stated that she had problems with anxiety, and that she was chronically tense and nervous. She described having racing thoughts, frequent thought ruminations, and constant worry that she cannot control.

Dr.  Storjohann conducted a Wechsler Adult Intelligence Scale Test- Fourth Edition (WAIS-IV) that showed the claimant has a full scale IQ of $60 \pm 4$. He  determined that the claimant's scores placed her intellectual functioning within the range of mild mental retardation. Dr. Storjohann stated that during the testing portion of the evaluation, the claimant put forth good effort and the test results appeared to represent an accurate appraisal of her current abilities. His diagnostic impression was that the claimant has a cognitive disorder, depressive disorder, generalized anxiety disorder, and mild mental retardation. He also assessed the claimant with a GAF score of 45, with 45 being the highest level in the past year. Dr. Storjohann stated that the prognosis for significant improvement during the coming six to twelve months was considered to be quite poor given her cognitive limitations, her

psychiatric difficulties, and her reported health problems. He believed that she was in need of more mental health treatment.

Dr. Storjohann evaluated the claimant's ability to do work-related activities, and determined that she had marked limitations in her ability to understand and remember simple instructions; to understand and remember complex instructions; to carry out complex instructions; to interact appropriately with supervisors and co-workers; and to respond appropriately to usual work situations and to change in a routine work setting. He also found that the claimant had extreme limitations in her ability to make judgments on complex work-related decisions. (R. 348-352).

*ALJ Hearing*

The claimant attended a video-conference hearing with the ALJ on November 1, 2011. Although she is pro se on her appeal to this court, the claimant was represented by counsel at the time of the hearing, who was also present with her by video-conference.

At the hearing, the ALJ asked the claimant why she quit her housekeeping job in 2007. The claimant responded that she "... couldn't hold up to it. My leg goes out on me, and my left arm. I ain't got no use for it or my hand." (R. 30). She also testified that the heaviest thing she had to lift at her housekeeping job was mattresses. (R. 29-33).

The claimant stated that she no longer had a driver's license and was scared to drive because her leg would "jerk." Regarding her daily activities, she testified that she could take care of her personal hygiene, cook, do the dishes, do laundry, and sweep or vacuum but with pain. She also testified that she occasionally went grocery shopping with her husband, but that he picked up the heavy items, such as a case of coke or a gallon of milk. She stated that the heaviest thing she could lift in the grocery store was a five-pound bag of flour. She also testified to using a cane, as well as

11

needing to take a break from walking every thirty minutes. The claimant stated that she was able to sit for an hour; that she no longer went to church or visited friends; and that she did word puzzles as a hobby. The claimant testified that she often had twitching in her hands that lasts five minutes or longer at times. She stated that these twitching episodes occur every day, sometimes up to three times a day. She also said that hot, cold and rainy weather worsens her pain, especially in her hands. The claimant testified that the Zoloft and Seroquel have improved her symptoms of anxiety and helped her sleep better. (R. 33-41).

The vocational expert testified regarding the claimant's past relevant work as a housekeeper. She stated that housekeeping may be light or unskilled, but if mattresses weighed more than twenty pounds, the claimant might have a problem flipping them. The vocational expert stated that a housekeeping job "might be bordering on medium versus light" work if required to turn mattresses. The ALJ gave the vocational expert a hypothetical that included light, unskilled, simple work that does not involve climbing on any ladders, exposure to cold, or wetness, or humidity, unprotected heights, and a lot of changes in the work setting. The ALJ asked the vocational expert to comment on whether a person like the claimant, with the listed limitations, would be able to do her past work as a housekeeper, to which the expert responded that she would. The vocational expert did not mention any other jobs that the claimant might be able to do. (R. 43-45).

*ALJ Opinion*

In a decision dated January 19, 2012, the ALJ first found that the claimant met the insured status requirements of the Social Security Act through December 31, 2007. The ALJ then analyzed the five-step sequential evaluation process for determining if the claimant was disabled and determined that the claimant had not been engaged in substantial gainful activity since March 29,

2007, the alleged onset date.

The ALJ then determined that the claimant had severe impairments including status-post transient ischemic attack, depression, anxiety, and mild mental retardation, but found that claimant's hypertension and atrial fibrillation were non-severe impairments. The ALJ stated that the claimant's severe impairments more than minimally impacted her ability to lift; carry; climb ladders; tolerate exposure to hazards and cold, wet, and humid environments; understand and remember; maintain concentration, persistence, or pace; and adapt to changes in the workplace. The ALJ determined that the claimant's hypertension was well-controlled according to a March 21, 2009 treatment note from Shade Tree Clinic. (R. 245). The ALJ also noted that the evidence in the record did not indicate that the claimant experienced any limitations as a result of her atrial fibrillation. Further, the ALJ found that the claimant's alleged bronchitis and arthritis had not been diagnosed by either a treating or consulting physician, and objective testing did not indicate arthritis. Regarding the claimant's pulmonary issues, the ALJ found that a consultative physical exam on March 23, 2010, indicated that the claimant had only occasional bilateral wheezing. (R. 13-14).

After analyzing the third requirement, the ALJ determined that none of the claimant's severe impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix 1. The ALJ did not discuss the claimant's severe physical limitations, but focused on her mental limitations. The ALJ found that the claimant did not meet or medically equal the criteria of listing §12.04, §12.05, and §12.06. The ALJ considered whether the claimant satisfied the "paragraph B" criteria found in paragraph B of listings §§ 12.02, 12.04, 12.06-12.08 and 12.10, and paragraph D of §12.05. These sections state that a mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining

social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. The ALJ determined that the claimant did not meet any of the listed impairments for either her physical or mental health issues. (R. 14).

In support of the ALJ's determinations, the ALJ stated that while the claimant experiences mild limitations in her ability to perform activities of daily living, the claimant testified that she can care for her own personal needs, cook occasionally with her husband, wash dishes, sweep, and vacuum with pain, and occasionally accompany her husband to the grocery store. The ALJ relied on the March 21, 2009 treatment note, from Shade Tree Clinic, where the claimant reported that her anxiety did not interfere with her ability to perform daily activities. (R. 14).

The ALJ considered the evidence of the claimant's social functioning and found that she had a mild limitation in her ability to function socially. He focused on the claimant's testimony that she did not visit socially with others, but also did not report having any problems getting along with others.

The ALJ did find that the claimant experienced marked limitations in her ability to maintain concentration, persistence, or pace. The ALJ relied on the results of a March 2, 2010 consultative mental status exam, performed by Dr. John Haney, that revealed that the claimant could not perform serial sevens, had difficulty performing simple calculations, and finding similarities between paired objects. She also recalled zero of three objects after five minutes, and she recalled three digits forward and two backward. The ALJ also relied on the November 7, 2011 full-scale IQ score of 60 ± 4 that was determined by Dr. Storjohann and the Wechsler Memory Scale. The ALJ stated that "relying on this evidence, the undersigned finds the claimant has a markedly limited ability to maintain concentration, persistence, or pace." (R. 15).

14

The ALJ stated that the claimant's mild mental retardation did not meet listing §12.05, because nothing in the record demonstrated that the claimant experienced significantly sub-average general intellectual function with deficits in adaptive functioning initially manifested during the developmental period. The ALJ indicated that because the claimant's mental impairment did not cause at least two "marked limitations" or a "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied. The ALJ did not specifically discuss §12.05C. (R. 15).

The ALJ also analyzed "paragraph C" and found that the claimant did not satisfy the "paragraph C" criteria, which applies to listings §§ 12.02, 12.03, or 12.04, and as reason for this determination, stated that the evidence failed to establish the presence of the "paragraph C" criteria. However, the ALJ did not support this statement with evidence from the record. The ALJ stated that the claimant did not meet listing §12.04 because the medical evidence did not contain instances of repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in marginal adjustment such that a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or a history of an inability to function outside of a highly supportive living arrangement. The ALJ determined that the claimant did not meet listing §12.06 because the medical evidence of record does not indicate that the claimant demonstrates a complete inability to function independently outside of the area of one's home. (R.15).

The ALJ determined whether the claimant had the residual functional capacity to perform light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b). The ALJ applied the pain standard to the claimant's subjective testimony regarding her symptoms. The ALJ weighed the

evidence from the medical record, and found that the claimant's statements concerning her symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment. (R. 16-19).

The ALJ discredited the claimant's testimony concerning her left-side weakness, and used the March 23, 2010 physical exam, conducted by Dr. Vakharia, as medical evidence to show that she had 4/5 strength in her left upper and lower extremities. The ALJ stated that the residual functional capacity assessment accommodated these findings by limiting the claimant to light work that does not involve concentrated exposure to the cold or hazards because of her slightly decreased strength and her testimony about how her pain increases in the cold. (R. 17). The ALJ indicated that the claimant's allegations of her symptoms, abilities and disabilities were less than credible. (R. 18).

The ALJ discussed the mental examinations of the three psychologists. The ALJ first analyzed the examination performed by Dr. Haney, and stated that the exam showed the claimant exhibited a somewhat impaired recent and remote memory, and that her intellectual functioning was estimated to fall within the lower end of the borderline range to mildly mentally retarded. The ALJ then looked at the mental examination performed by Dr. Storjohann, and his determination that the claimant had a full scale IQ of $60 \pm 4$. The ALJ stated that the findings of the Wechsler Memory Scale indicated that the claimant achieved visual, delayed and immediate memory scores in the extremely low range, but that the residual functional capacity assessment accommodates these negative objective findings by limiting the claimant to simple, unskilled work, with only occasional changes in the workplace. (R. 17).

The ALJ placed little weight on the medical opinion of Dr. Haney, and stated that the

objective medical evidence of record failed to support the opinion that the claimant had a severely impaired ability to perform most jobs. The ALJ pointed to evidence of the March 21, 2009 treatment note, from Shade Tree Clinic, that stated that the claimant's mild anxiety did not warrant the risks of treatment and did not interfere with her ability to perform daily activities. The ALJ considered the claimant's statement that her prescribed medication helped control her symptoms of anxiety and depression. The ALJ gave little weight to the medical opinion of Dr. Haney, because his statement was silent as to the actual limitations the claimant has, and whether the claimant can perform basic work activity. (R. 17-18).

The ALJ gave some weight to the medical opinion of Dr. Storjohann that the claimant has marked deficits in her ability to understand, remember, and carry out instructions, and adapt to changes in the workplace. The ALJ gave little weight to Dr. Storjohann's opinion that the claimant has marked limitations in her ability to respond appropriately to supervisors and coworkers, because the claimant did not report having any problems getting along with others, and further, the medical evidence did not support the opinion that the claimant has marked limitations in social functioning. (R. 18).

Although the ALJ did not expressly refer to Dr. Fleece by name, the ALJ's findings were based on Dr. Fleece's examination. Dr. Fleece stated in his Mental Residual Functional Capacity Assessment that the claimant was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 276).  The ALJ relied on these findings in the opinion. (R. 15).

After this analysis, the ALJ determined that the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: must be simple, unskilled work; must avoid ladders; must avoid concentrated exposure

to hazards, and cold, wet, or humid environments; and can have occasional changes in the work setting. The ALJ found that the claimant could perform her past relevant work as a housekeeper, so long as it does not require the performance of work-related activities precluded by the claimant's residual functional capacity. The ALJ did not discuss other jobs that would fit into these limitations. (R. 19).

## V. DISCUSSION

### A. Whether the ALJ's finding that the claimant did not meet Medical Listing §12.05C regarding her mental impairments lacks substantial evidence.

The ALJ did not provide substantial evidence to properly support his finding that the claimant did not meet the Medical Listing §12.05C regarding mental retardation. This court finds that substantial evidence does not support the ALJ's reasons for discrediting the medical opinion of Dr. Haney and Dr. Storjohann, or the claimant's deficits in adaptive functioning.

The Eleventh Circuit has determined that, for a claimant to be disabled under §12.05, "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir.1997). Medical Listing §12.05C requires a valid verbal, performance, or full scale IQ of 60 through 70 and another physical or mental impairment imposing an additional and significant work-related limitation or function. *Crayton*, 120 F.3d at 1219. A valid IQ score need not be conclusive of mental retardation when the IQ score is inconsistent with other evidence in the record concerning the claimant's daily activities and behavior. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992).

According to the WAIS-IV test administered by Dr. Storjohann, on November 7, 2011, the claimant's full scale IQ is $60 \pm 4$. Dr. Storjohann stated that the claimant put forth a good effort, and

that the IQ test score appeared to be an accurate appraisal of her current abilities. In addition to the IQ score, the claimant also had a history of learning issues, and testified that she had problems with reading, comprehension, expressive writing skills, and mathematics. The claimant did not receive a high school diploma, and reported to Dr. Storjohann that she was required to repeat the third grade.

This court finds that the ALJ treated Dr. Storjohann's finding of a full scale IQ of $60 \pm 4$ as a valid IQ score. In her opinion, the ALJ does nothing to discredit the full scale IQ score determined by Dr. Storjohann. In fact, the ALJ seems to agree with the IQ score finding. In her opinion, the ALJ stated, "[t]he findings of a November 7, 2011 Wechsler Memory Scale, demonstrated the claimant achieved visual, delayed, and immediate memory scores in the extremely low range. Relying on this evidence, the undersigned finds the claimant has a markedly limited ability to maintain concentration, persistence or pace." (R. 15). Because of that statement, and the absence of the ALJ discrediting the IQ score, this court finds that the ALJ relied on Dr. Storjohann's IQ test, and found the IQ score of $60 \pm 4$ to be valid.

While this court finds that the ALJ relied on the full scale IQ score as valid, the ALJ found that the claimant has no deficits in adaptive functioning that manifested before the age of 22. The ALJ stated that "[n]othing in the evidence of record demonstrates that the claimant experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period i.e. the evidence demonstrates or supports onset of the impairment before age 22."(R. 15). Substantial evidence does not support the ALJ's determination that the claimant did not have deficits in adaptive functioning manifested during the developmental period.

Adaptive functioning is an "individual's progress in acquiring mental, academic, social and

personal skills as compared with other unimpaired individuals of his/her same age." Programs Operation Manual System DI 24515.056(D)(2).  Also, a full scale IQ score, between 60 and 70, raises the rebuttable presumption that the claimant manifested deficits in adaptive functioning prior to the age of 22, not only at the time of testing. *Hodges v. Barnhart*, 276 F. 3d 1265, 1268-1269 (11th Cir. 2001).

The ALJ held that the claimant's daily activities indicate that the claimant lacked deficits in adaptive functioning required to meet listing §12.05C. The ALJ specifically noted that the claimant had only mild limitations in activities of daily living because she could "care for her own personal needs, cook occasionally, wash dishes, sweep, vacuum– albeit with pain, and shop." The ALJ also discredited Dr. Storjohann's opinion that the claimant had marked deficits in her ability to respond appropriately to supervision, coworkers, and work pressures in the work setting. The ALJ stated that her only reason for discrediting Dr. Storjohann's findings was that "the claimant testified she does not visit others socially, but she did not report having any problems getting along with others. Taken together, the undersigned finds that the claimant has a mildly limited ability to function socially." (R. 15). The ALJ's finding, that the claimant's ability to do these activities equates to her having no deficits in adaptive functioning, is not supported by substantial evidence.

The record reflects that, while the claimant is able to care for her personal needs, she can only perform minimal, light housework; laundry with the help of her husband; occasionally cooks and goes grocery shopping with her husband; occasionally goes to church, and only spends time with family members. The ALJ points to the fact that the claimant goes to church, and has never reported difficulties getting along with others, as substantial evidence to show that she does not have marked limitations in social functioning. The claimant testified that she does not socialize with anyone but

20

her family, and only goes to church or grocery shopping occasionally. Substantial evidence does not support the ALJ's finding that the claimant has no deficits in adaptive functioning simply because the she can be around her family and goes places occasionally.

In fact, substantial evidence in the record actually supports the finding that the claimant *does* have deficits in adaptive functioning. The ALJ gave some weight to Dr. Storjohann's opinion that the claimant had marked deficits in her ability to understand, remember, and carry out instructions and adapt to changes in the workplace. The ALJ gave little weight to Dr. Haney's opinion that the claimant has a moderately to severely impaired ability to function in most jobs because his statement was silent as to the actual limitations the claimant has and the decision as to whether the claimant can perform basic work activity. Yet, Dr. Haney did identify specific limitations the claimant had regarding deficits in adaptive functioning. Dr. Haney stated that the claimant is unable to subtract serial sevens; had difficulty with other simple problems in change-making and arithmetic; had difficulty finding similarities between paired objects and interpreting simple proverbs; and could recall zero of three objects after five minutes. Dr. Fleece, whose opinion the ALJ depended upon, also stated that the claimant had marked limitations in her ability to understand and remember detailed instructions, and marked limitations in her ability to carry out detailed instructions. These deficits, along with the facts that the claimant cannot drive and does not have a checking or savings account, show that the record as a whole does not support the ALJ's finding that the claimant has no deficits in adaptive functioning.

The claimant has presented substantial evidence that she does have deficits in adaptive functioning. Because the claimant has presented this evidence, along with a valid full scale IQ score of $60 \pm 4$, the ALJ must presume mental impairment before age 22, because mental retardation

generally does not improve as a person ages. *see Hodges*, 276 F.3d at 1269.

The claimant also has presented substantial evidence that, in addition to her valid IQ score of 60 ± 4, she also has the severe impairments of post-transient ischemic attack, depression, and anxiety, another requirement to meet §12.05C. The ALJ, in finding that the claimant suffers from such severe impairments, acknowledged that the claimant has additional mental impairments that affect her ability to work.

This court finds that substantial evidence does not support the ALJ's determination that the claimant does not have deficits in adaptive functioning, or that such deficits did not manifest before the age of 22. Also, substantial evidence does not support the ALJ's finding that the claimant's valid full scale IQ score of 60 ± 4, in addition to her other severe impairments of status-post transient ischemic attack, depression, and anxiety, would not meet listing §12.05C.

## VI. CONCLUSION

For the above reasons, the court finds that substantial evidence does not support the ALJ's decision that the claimant did not meet listing §12.05C. Therefore, the court will reverse the Commissioner's decision and will remand it for the ALJ to determine whether the claimant is entitled to disability benefits.

A separate Order will be entered.

DONE and ORDERED this 31st day of July 2014.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE